# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:10-CR-131** |
| | : | |
| v. | : | **(Judge Conner)** |
| | : | |
| **JOSE M. ORTIZ, JR.** | : | |

## MEMORANDUM

Presently before the court is a motion (Doc. 17) to suppress evidence, filed by defendant Jose M. Ortiz, Jr. ("Ortiz"). The court held an evidentiary hearing on Ortiz's motion on July 1, 2010.[1] For the reasons that follow, the motion will be denied.

## I. Findings of Fact[2]

On March 10, 2010, around 1:10 p.m., various members of the York County Drug Task Force were conducting a drug investigation into the distribution of heroin in the city of York, York County, Pennsylvania. (Hr'g Tr. at 2). Trooper Wolf, a member of the Pennsylvania State Police Troop H Vice and Narcotics Unit and the York County Drug Task Force,[3] was working with a confidential informant ("CI") who indicated he/she could purchase a quantity of heroin from an individual he/she knew as "Junior." (Id.) From a photograph the CI identified the individual

---

[1] Citations to the July 1, 2010 hearing transcript are abbreviated throughout as "Hr'g Tr."

[2] These findings are based on the court's determination of credible testimony presented at the July 1, 2010 evidentiary hearing.

[3] Trooper Sean Wolf has been a member of the vice narcotics unit for approximately three and one-half years. (Hr'g Tr. at 2).

known as "Junior" as the defendant, Jose M. Ortiz, Jr. ("Ortiz"). (Id. at 3). The CI placed a call to the individual he/she knew as Junior and arranged a meeting location for the drug buy—a garage at 100 Church Avenue, York, Pennsylvania, owned by Ortiz. (Id.) Prior to the meeting, the CI was searched for contraband. (Id. at 4). No contraband was found. (Id.)

The CI was provided with $1100 for the transaction, after which Detective Fenstermacher, supervisor of the York County Drug Task Force, transported the CI to the arranged location. (Id.) Officers observed the CI approach the garage, the garage door roll up, the CI enter, and the garage door roll back down. (Id. at 32-33). A few minutes later the CI exited the garage, (id. at 31), and returned to the vehicle of Detective Fenstermacher, where the CI turned over 15 bundles (or 150 bags) of heroin. (Id. at 5).

After the deal, another task force member, Detective Nadzom, observed Ortiz exiting his garage and entering a gravel lot in a fenced area of the property. (Id. at 30.) A six to seven foot tall fence with a gate surrounded much of the property, and a four to five foot brick or cinder block wall surrounded another portion of the property. (Id. at 14-16, 43, 49). Detective Nadzom observed Oritiz standing next to the four to five foot brick or concrete wall speaking with a neighbor. (Id. at 17, 39).

As soon as the drugs were in Detective Fenstermacher's possession, the arrest signal was given by Detective Nazdom. (Id. at 31-32). Officers entered the property to execute the arrest, some jumping over the fence, others entering

through a gate.[4] (Id. at 14). Ortiz was placed in custody and then escorted back towards his garage where he was handcuffed, informed of his *Miranda* rights, and told why he was being arrested. (Id. at 6). Officers had neither an arrest warrant nor a search warrant at the time of Ortiz's arrest. (Id. at 20). During the search of Ortiz incident to his arrest, Ortiz was found to be in possession of the $1,100 used for the buy, $160 in his wallet, $76 in his left front pocket, and a cellular telephone with a phone number that matched the number dialed by the CI to arrange the transaction. (Id. at 11).

Trooper Wolf, who had escorted Ortiz into his garage, proceeded to engage Mr. Ortiz in conversation. (Id. at 6-7). Corporal Hassinger was also present while two other troopers with the Pennsylvania State Police remained in the area, but not within the garage. (Id.) No weapons were drawn. (Id. at 7). Trooper Wolf asked Ortiz if there was anything illegal in the garage and orally requested permission to search the garage. (Id.). Ortiz consented to a search of the garage indicating there was nothing illegal present. (Id. at 52).

Trooper Wolf continued the conversation, asking Ortiz about his residence. Ortiz eventually related that he had 30-40 grams of heroin, approximately $8,000 cash, and a handgun at his residence located at 106 East College Avenue, York,

---

[4] Trooper Wolf testified he jumped over the cinder block wall, Officer Shower and Corporal Hassinger went through the gate and one officer went over the fence. (Hr'g Tr. at 14). Ortiz claims the officers entered his property through his garage, (id. at 50), however testimony by the officers and detectives, which the court credits, does not indicate that any law enforcement official entered Ortiz's garage to carry out the arrest.

Pennsylvania. (Id. at 7-8). Ortiz orally consented to a search of the College Avenue address while in the garage.[5] (Id. at 26, 40). Trooper Wolf then escorted Ortiz to the front passenger seat of his vehicle and drove Ortiz to the 106 College Avenue residence. (Id. at 16). Trooper Wolf pulled his vehicle inside the attached garage at the rear of that residence. (Id.) Officers were already present inside the home.[6] (Id. at 25). Ortiz requested to use the restroom and was permitted to use the one in his garage. (Id.)

Trooper Wolf continued to converse with Ortiz in the residence garage and presented him with a consent-to-search form. (Id. at 9). Trooper Wolf read the entire consent form aloud for the benefit of Mr. Ortiz. (Id.) Trooper Wolf escorted Ortiz into the kitchen, and Ortiz was permitted to make a cup of coffee. (Id. at 10). Trooper Wolf went over the consent form again. (Id.) Ortiz was cooperative, indicated that he was familiar with the system, and repeatedly stated that he had no questions about what was going on. (Id. at 23). While sitting at the kitchen table, in the presence of Trooper Wolf and Corporal Hassinger, Ortiz signed the consent form to search the house and attached garage at 106 College Avenue and the garage and vehicles at 100 Church Avenue. (Id. at 23-24; Gov't Exhibit 1). The consent

---

[5] Ortiz contests this point and claims that he did not give consent to search his home until present in his home surrounded by a house full of officers. (Hr'g Tr. at 54-55). Ortiz testified that his consent was coerced and that officers threatened to "start breaking the walls." (Id. at 56). The court does not credit this testimony.

[6] Officers had been sent to the residence at 106 College Avenue to secure the premises prior to the arrival of Trooper Wolf and Ortiz. (Id. at 36).

4

form was signed at 1:45 p.m., (Gov't Exhibit 1), after which officers commenced the search.

On April 21, 2010, Ortiz was indicted by a grand jury for offenses related to his alleged drug trafficking activities and for being a felon in possession of a firearm. He pled not guilty to the charges on May 4, 2010. In the instant motion to suppress, Ortiz seeks to exclude the evidence found on his person after the arrest and the evidence discovered in the search of his residence and garages. This motion has been fully briefed and is ripe for disposition.

**II.     Discussion**

**A.     The Arrest**

The Fourth Amendment of the United States Constitution secures "persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. Searches and seizures of persons or property within the home without a warrant are presumptively unreasonable: "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). However, the Supreme Court has long recognized that a warrantless arrest of an individual in a public place, when supported by probable cause, does not violate the Fourth Amendment. See United States v. Watson, 423 U.S. 411, 423-424 (1976). In the present case, Ortiz was in a fenced-in area on his own property at the time of his arrest. He was neither within his residence, nor in

an area typically considered a public place.  Therefore, the court turns to more nuanced Fourth Amendment jurisprudence.

The Fourth Amendment protects those areas where a person has a reasonable expectation of privacy.  A reasonable expectation of privacy determination is a two-part test: First, the individual must have a subjective expectation of privacy in the area or object he claims is protected.  Second, the expectation of privacy must be one that society is willing to recognize.  Katz, 389 U.S. at 361 (Harlan, J., concurring).  Nowhere is that expectation of privacy stronger than in the home.  However, courts have recognized that "an individual reasonably may expect that an area immediately adjacent to a home will remain private."  Oliver v. United States, 466 U.S. 170, 180 (1984).  For this reason, the protections afforded to the home have been extended to the outdoor area surrounding the home known as the "curtilage."  See U.S. ex. Rel. Boyance v. Myers, 398 F.2d 896, 899 (3d Cir. 1968) ("We have no doubt that the protection of the Fourth Amendment extends beyond the walls of a home to 'the 'curtilage' or ground and buildings immediately surrounding a dwelling[.]'" (citing Rosencranz v. United States, 356 F.2d 310, 313 (1st Cir. 1966)).

1. **Curtilage**

The curtilage is an area around the home in which the private, and intimate activities of the home extend.  United States v. Dunn, 480 U.S. 294, 301 (1987) (noting that curtilage areas are those which "harbor[] the intimate activity associated with the sanctity of a man's home and the privacies of life" (quoting

6

Oliver v. United States, 466 U.S. 170, 180 (1984)) (quotations omitted)). "For most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." Oliver, 466 U.S. at 182 n.12. Where the boundaries are not so clear, the Supreme Court has set out four factors for courts to consider in determining whether a given area falls within the curtilage of a residence and thus "under the home's 'umbrella' of Fourth Amendment protection." United States v. Dunn, 480 U.S. 294, 301 (1987). Courts should consider:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

Id.; see also United States v. Minker, 312 F.2d 632, 634 (3d Cir. 1963) (noting factors of proximity to dwelling, enclosures surrounding the dwelling and domestic use). No one factor is dispositive. Each will be considered in turn.

      a.    *Proximity to the home*

The garage structure and fenced area located at 100 Church Avenue are not connected to the residence at 106 College Avenue. Although the garage need not be connected to the residence to be within the curtilage of a residence, see Taylor v. United States, 286 U.S. 1, 6 (1932) (garage adjacent to city residence within curtilage of the residence), distance is particularly relevant. In United States v. Dunn, 480 U.S. 294 (1987), a barn on the same property as the home, but located 60 yards from

7

the home and not within the fence surrounding the home, was held not to be within the curtilage of the home. In the instant matter, the garage structure and fenced lot combine to form a separately addressed property. This does not strip the property of all Fourth Amendment protections, but it weighs against a finding that the property is within the home's curtilage and entitled to the same protections as the home.

### b.   *Enclosures*

The property at 100 Church Avenue, which included the garage structure, is clearly demarcated by a fence. Although part of the fence around the garage structure was six to seven feet tall, part of the enclosure consisted of a cinder block wall no more than four or five feet tall. It is undisputed that Ortiz was visible within that fenced area. Detective Nazdom testified that he viewed Ortiz exit the garage into the fenced area of the lot and speak to a neighbor at the fence. (Hr'g Tr. at 17, 39). Detective Nazdom's view was not obstructed by trees, nor is there any suggestion that he undertook special efforts, or utilized special equipment to view inside the fenced area. Accordingly, this factor weighs against a finding of Fourth Amendment protection.

### c.   *Nature and uses of area*

Particularly relevant in the weighing of these factors is the nature and use of the area where Ortiz was arrested. The record is devoid of any suggestion that the "intimate activities" of the home would extend to a clearly visible lot. This area does not harbor the activities of home life, particularly when the actual residence is

8

located on a separate lot—a lot that itself contains a garage—and which is neither attached or adjacent to the lot in question.

### d.   *Steps taken to protect the area from observation*

Finally, the court considers the steps taken to protect the property at 100 Church Avenue from observation. As discussed above, though partially surrounded by a six to seven foot tall fence, part of the lot was enclosed by a four to five foot cinder block wall. Passersby would have a clear view of portions of the fenced in area, just as Detective Nazdom did in the present case. The Supreme Court makes clear that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). For example, an individual standing in the doorway of his residence is considered to be in a public place for purposes of the Fourth Amendment warrant requirement. United States v. Santana, 427 U.S. 38, 42 (1976) (noting that by standing in her doorway the defendant "was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house").[7]

The situation in this case is distinguishable from cases such as United States v. Struckman, in which the Ninth Circuit found a fenced-in backyard to fall within

---

[7] In United States v. Brown, the First Circuit held that a defendant's driveway, where freely exposed to public view, was not within the home's curtilage 510 F.3d 57, 66 (2007). The Brown court ruled in this fashion despite the fact that the section of the driveway where Brown was arrested (although accessible to the public) was not visible from the public street. Id. at 66.

the home's curtilage. 603 F.3d 731, 736 (9th Cir. 2010). In Struckman, officers entered a fenced-in backyard of a home enclosed by a six foot tall fence, but officers had to climb atop objects and peek through small holes in the fence to see what was happening in the backyard of the residence. Id. Here, though the 100 Church Avenue lot was fenced in, it was neither the backyard of a domestic residence, nor was the view of the fenced lot obstructed in such a way that officers had to take special measures to see what was happening within it.

Finding that Ortiz was clearly visible within the fenced lot and that the lot is located some distance from the residence, the court holds that the lot area is not within the curtilage of the home. Ortiz had no reasonable expectation of privacy in the area where he was plainly visible to officers and other passersby. As such, the warrantless arrest is valid if supported by probable cause.

### 2. Probable Cause

Ortiz's arrest while standing in a fenced-in portion of a lot owned by him did not require a warrant if the arrest was supported by probable cause. Probable cause exists when circumstances within a police officer's knowledge are sufficient to warrant a prudent person to conclude that a person has been or is committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964). Mere suspicion is insufficient, but evidence beyond a reasonable doubt is not required. Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995). Although it is clear that none of the officers involved in the investigation personally saw the drug buy, the arrest was adequately supported by probable cause.

A Confidential Informant identified Ortiz by photograph as a person from whom the CI had previously bought drugs. (Hr'g Tr. at 3). The CI indicated that the location of the drug buy was the same as previous occasions on which the CI had purchased drugs, a property which is owned by Ortiz. The CI placed a call to the cell phone of the individual who would supply the drugs. (Id. at 3). Police observed the CI enter and exit the property owned by Ortiz, and return with 150 bags of heroin. (Id. at 5). Given these circumstances, officers had sufficient probable cause to arrest Ortiz without a warrant.

  **B.**  **Consent to Search the Garages and the House**

Having determined that Ortiz's arrest was lawful, the remaining question is whether Ortiz voluntarily consented to the search of his garage at 100 Church Avenue and the garage and home at 106 College Avenue, thus vitiating the need for a search warrant.

Neither a warrant nor probable cause is required to search an area when the party in control of that area gives consent to search. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Prince, 558 F.3d 270, 277 (3d Cir. 2009). The burden is on the government to prove consent was freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548 (1968). Consent coerced by threats or force is not voluntary, but there is no requirement that the individual giving consent be aware of his right to refuse consent, or that officials inform the individual of his right to do so. Schneckloth, 412 U.S. at 229-30, 231; United States

v. Lockett, 406 F.3d 207, 211 (3d Cir. 2005). Voluntariness determinations are to be based on the totality of the circumstances. Schneckloth, 412 U.S. at 227.

> [W]hether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single criterion. Certain factors that courts consider in determining whether confessions were voluntary, such as the age of the accused, his education, his intelligence, whether he was advised of his constitutional rights, and whether the questioning was repeated and prolonged are relevant to [the court's] examination.

United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994); see also United States ex rel. Harris v. Hendricks, 423 F.2d 1096, 1099 (3d Cir. 1970) (noting critical factors of voluntariness analysis to include the setting in which consent was obtained, and what was said by the parties present, particularly the individual consenting). No one factor is dispositive or controlling.

Custody is but one factor in the voluntariness analysis. Though custodial consent prompts 'more careful scrutiny,' see United States v. Puglisi, 7910 F.2d 240, 243 (2d Cir. 1986), individuals who are in custody can voluntarily consent to a search. See United States v. Arango-Correa, 851 F.2d 54, 56,57 (2d Cir. 1988) (individual in custody for five hours voluntarily consented to search); United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973) ("a defendant under arrest or in custody may voluntarily consent to a search"); id. ("the fact of arrest does not necessarily vitiate what otherwise appears to be valid consent"). Indeed, custody alone has never been enough to find coerced consent. See United States v. Watson, 423 U.S. 411, 424 (1976) ([T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search.").

Ortiz was clearly in custody and had been informed of his *Miranda* rights prior to the conversation that led to his consent. See United States v. Menke, 468 F.2d 20, 25 (1972).[8] However, Trooper Wolf maintained a conversational tone with Ortiz throughout their discussions. All weapons were holstered, and while officers may have been passing by, conversations were held only in the presence of Trooper Wolf and Corporal Hassinger. Though Ortiz was handcuffed,[9] he was treated in a courteous manner. Ortiz was driven to his residence at 106 College Avenue, not in the backseat of a squad car, but in the front seat of Trooper Wolf's vehicle. (Hr'g Tr. at 16). Ortiz was permitted to use the restroom at his residence, and he was allowed to make a cup of coffee and sit at his kitchen table. (Id. at 10, 25). The consent form was read to him, and it clearly indicated that Ortiz had the right to refuse consent. (See Gov't Exhibit 1). At all times Ortiz remained cooperative with officers and indicated he knew what was going on and was familiar with the process. (Id. at 23.) Ortiz was informed of his *Miranda* rights upon his arrest; thus,

---

[8] In Menke the defendant's car was searched for drugs after he was arrested and given his Miranda warnings. The Third Circuit held in the alternative to its finding that there was probable cause to search the vehicle without a warrant, that the defendant had assented to the search of the automobile. United States v. Menke, 468 U.S. F.2d 20, 24-25 (1972).

Additionally, the court in Menke reaffirmed Third Circuit precedent that an individual in custody "[h]aving been warned that anything he said could be used against him, it is inconceivable that his election to . . . deliver [the evidence] up to the police was anything less than a free and voluntary abandonment of his security in this otherwise constitutionally protected area." Id. (citing Government of Virgin Islands v. Berne, 412 F.2d 1055, 1061 (3d Cir. 1969)).

[9] It is not clear if Ortiz remained handcuffed throughout the conversations and searches, but he was placed in handcuffs when he was arrested. (Hr'g Tr. at 6).

13

he was aware he had the right to remain silent.  See Kim, 27 F.3d at 955 (discussing defendant's cooperation, ready agreement to consent to search, police officer's conversational and courteous tone, and that the officer was the only one visible during the conversation as factors indicating consent was voluntarily given); Arango-Correa, 851 F.2d at 56 (noting factors including that defendant was arrested by garage, given *Miranda* rights, was not handcuffed, that agents had no weapons and used a normal tone of voice in conversation with defendant as factors indicating defendant's consent to search was voluntary).  Based on the totality of the circumstances the court finds that Ortiz gave his consent to search the garages and his residence voluntarily.  No search warrant was required.

### III. Conclusion

For the foregoing reasons, the motion to suppress is DENIED.

An appropriate order follows.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Date: September 14, 2010

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA** : **CRIMINAL NO. 1:10-CR-131**
:
**v.** : **(Judge Conner)**
:
**JOSE M. ORTIZ, JR.** :

## **ORDER**

AND NOW, this 14th day of September, 2010, upon consideration of the motion (Doc. 17) to suppress evidence, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 17) is DENIED.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge